IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES A. MARKLE and<br>LINDA M. MARKLE, his wife | : | 02-CV-2607 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LANGSTON CORPORATION and<br>PRIME TECHNOLOGY, INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## **ORDER**

AND NOW, this _____ day of _____ 2003, upon consideration of defendant Prime Technology, Inc.'s Motion in Limine and any Responses thereto, IT IS HEREBY ORDERED that defendant's Motion is GRANTED, plaintiffs have waived the $175,000 self-insured retention amount relevant to defendant Langston Corporation's insurance program.

BY THE COURT:

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES A. MARKLE and<br>LINDA M. MARKLE, his wife | : | 02-CV-2607 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LANGSTON CORPORATION and<br>PRIME TECHNOLOGY, INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANT PRIME TECHNOLOGY, INC.'S
MOTION IN LIMINE RE: PLAINTIFFS' WAIVER OF
LANGSTON CORPORATION'S SELF-INSURANCE RETENTION AMOUNT**

Defendant Prime Technology, Inc. hereby incorporates its Memorandum of Law in Support of its Motion in Limine and requests the relief outlined in the attached Order.

Respectfully submitted

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant,
Prime Technology, Inc.

John A. Orlando, Esquire
Identification No. 38420
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-7176

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| JAMES A. MARKLE and | : | |
| LINDA M. MARKLE, his wife | : | |
| Plaintiffs, | : | |
| v. | : | 02-CV-2607 |
| LANGSTON CORPORATION and | : | |
| PRIME TECHNOLOGY, INC. | : | |
| Defendants. | : | |

_____:


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION *IN LIMINE* ON BEHALF
OF DEFENDANT PRIME TECHNOLOGY**


**INTRODUCTION**

This matter involves personal injuries allegedly sustained by plaintiff James A. Markle on June 29, 2000, while working on the Saturn model Flexo Folder-Gluer Counter-Ejector (Saturn FFG). Markle alleges that while leaning on the sidebed with his left hand to straighten some corrugated blanks with his right hand, his left hand slipped under the toe guard and became caught in the nip point causing a crushing injury to his left, non-dominant hand.

**FACTUAL BACKGROUND**

**I. The Products**

In approximately 1988, co-defendant Langston Corporation (Langston) sold a Saturn model Flexo Folder-Gluer Counter-Ejector to the Mount Carmel, PA facility of Cardinal Container which was later purchased by International Paper. As described by Langston:

> The Saturn Flexo Folder-Gluer Counter-Ejector is a combination of individual machine sections which accept a stack of blanks (sheets) and discharge printed, slotted and glued collapsed boxes in bundles of pre-determined count.

See Langston Finishing Machinery Operation and Maintenance Technical Literature Bulletin.

The Saturn Flexo Folder-Gluer Counter-Ejector (Saturn FFG) that plaintiff was running at the time of his accident was also equipped with a pre-feed section which automatically fed the corrugated blanks into the feed section of the Saturn FFG.

The Saturn FFG begins its work of converting corrugated sheets into printed, slotted and glued collapsed boxes at the feed section. As its name implies, the feed section takes a single corrugated blank and feeds it in a timed system into the next printing section of the Saturn FFG.

Although Langston's Chapter 11 Bankruptcy filing was converted to a Chapter 7 filing, its former chief engineer, George Mills, was available for deposition. Mr. Mills explained that on the Saturn FFGs, Langston typically sold a kicker feeder, this first machine section in the Saturn FFGs would literally grab a single corrugated blank and kick it into the first nip point so that the blank could begin its process through the various sections and become a completed collapsed cardboard box. The kicker feeders, however, presented problems because corrugated tends to warp and any warped blanks would jam rather than feed properly into the machine. Beginning in the 1970s, efforts were made to provide vacuum assistance, the vacuum would pull

down on the corrugated blanks, the idea was to overcome the natural warping of the corrugated blanks so that the kicker feeder would not jam so often.

The initial vacuum assistance designs for the kicker feeders were only partially successful. In the middle 1980s, defendant Prime Technology, Inc. (Prime) developed a kickerless feeder, this component, by means of rollers, would grab the leading edge of a single corrugated blank, pull it down flat to remove any warpage by means of the rollers and a vacuum system and the blanks would be literally rolled into the initial nip point on the printing section of various Flexo Folder-Gluers.

Cardinal Container, the predecessor to International Paper, plaintiff's employer at the time of the accident, purchased a Saturn FFG but specifically requested of Langston that a Prime leading edge feeder be incorporated at the feed section of the Saturn FFG. The critical component to the Prime leading edge feeder was the wheel box, the central portion of the feeder. The Prime leading edge feeder was particularly sought after because the drive wheels feeding the corrugated blanks were powered through a rocker shaft from other components in this group of machines through linkage, the Prime leading edge feeder did not require its own transmission.

Because its customer requested it, Langston ordered a Prime leading edge feeder so it could incorporate that component into its Saturn FFG which it was then building for plaintiff's employer. Langston received the Prime leading edge feeder and sidebeds and other parts and built the leading edge feeder into the frame which supports all of the machinery that composes the Saturn FFG. The moving parts to the leading edge feeder are centered, the sidebeds are 11 gauge steel supported by frames for the Langston Saturn FFG and the sidebeds cover the various rocker shafts and transmission parts which run all components of the Saturn FFG. Prime also supplied mounting clips, small pieces of angle iron which provide further support for the

sidebeds. Actually mounting the sidebeds was a task performed by Langston, Langston was fully aware of the need to mount the sidebeds firmly and securely and, of course, pursuant to OSHA regulations, Langston was required to test all components of the machine before shipping and installing it at Cardinal/International Paper.

Consistent with the drawings at Exhibit 3 and as actually measured by the various experts who examined the machine after this accident, the operator sidebed shipped by Prime to Langston was an L-shaped stainless steel fabrication, the leg of the "L" was approximately 15 inches, the upright or length of the "L" formed a flat surface for the sidebed table and it measured 31-5/8 inches in length. The sidebed was 20-3/8 inches wide. The flat surface portion of the sidebed was shipped as a complete rectangle, however, apparently to make room for other Langston equipment, Langston cut a portion from the operator side inboard edge of the surface of the sidebed.

The initial nip point, the two rollers that accept the corrugated blank from the leading edge feeder as it begins its process through the Saturn FFG is guarded by a yellow toe guard.[1]

In this case, according to the Prime records, the leading edge feeder was designed with a 4-3/4 inch stroke which would be the distance from the face of the gate[2], actually mounted on the toe guard, to the first nip point, the initial rollers on the first printing station. Since the distance from the nip point to the toe guard was probably about 3-1/2 inches, allowing an inch or so for

---

[1] In the olden days, workers might need to stand on a sidebed to maintain the kicker feeder or for a variety of reasons to keep the machine functioning. Thus, the initial guard was called a toe guard. The distance between the top of the sidebed and the bottom of the toe guard is critical, that distance is actually governed by an OSHA standard. If the nip point is very close to the back of the toe guard, then the toe guard must be very close to the top of the sidebed. If the nip point is farther back, the space between the guard and the sidebed can be a little higher, for example it might be permissible to allow a finger under the toe guard as long as the hand, wrist and forearm could not get there if the nip point was far enough behind the toe guard.

[2] The gate is raised or lowered depending on the corrugated blank to permit only one blank at a time to pass into the first set of rollers.

the width of the gate, OSHA standards dictate that the maximum opening beneath the toe guard to the top of the sidebed would be one-half inch. The actual height of the opening between the bottom of the toe guard and the top of the sidebed on the date of this accident remains very much in dispute.

Specifically, Langston's former chief engineer George Mills testified that the height of the toe guard would range from .6 inches to .75 inches to allow for the thickest corrugated blank that could be printed, folded and glued on the Saturn FFG. The Langston assembly drawing, which Langston apparently claims was not indicative of this as-built machine, included instructions for the workers installing the toe guard at a customer's plant to install it at $15/16^{ths}$ of an inch above the top of the sidebed. To free Mr. Markle after his hand was caught in this nip point, below the toe guard but above the sidebed, co-workers used pry bars and eventually unbolted the toe guard. The employer claims that the toe guard was placed back into the same position as before the accident and that it was not changed until the date of the inspection by the various experts involved in this case. On that date, the distance between the bottom of the toe guard and the top of the sidebed was about $5/16^{ths}$ of an inch. Langston claims that the toe guard was not adjustable and thus that $5/16^{ths}$ of an inch measurement represents how the Saturn FFG was originally configured. However, Paul Zarko, a maintenance worker at International Paper, testified that International Paper issued a directive before this accident occurred calling for all toe guards to be dropped, the company wanted toe guards on all machines including the Saturn FFG to be lowered. Mr. Zarko testified that he knew the toe guard on the Saturn FFG had been lowered before the date of the accident although he was not able to provide any measurement. Photographs of the toe guard taken at various times show that the toe guard was painted and the mounting bolts may be different.

-5-

**II. The Accident Facts**

Plaintiff James Markle, DOB: 7/1/44, is only 5'3" tall and weighs only about 160 lbs. Although he worked for International Paper for eight years, he worked as an operator of the Saturn FFG for about two years. Mr. Markle testified that he leaned on the sidebed with his left hand while reaching with his right hand to straighten some corrugated blanks coming from the pre-feeder and entering the feeder, which is the first section of the Saturn FFG, the component made by Prime. Those blanks, however, would be landing on the top of the pile ready to be fed by the leading edge feeder into the initial nip rolls. Only the bottom blank actually gets fed into the nip rolls. As the blanks lower through the pile, kickers on each side vibrate and straighten the blanks. Thus, Mr. Markle's manual efforts to tap some of the corrugated blanks was probably totally unnecessary. However, the goal at International Paper is clearly to keep the machine running, downtime is not conducive to meeting production goals. Various witnesses from International Paper testified that it would not be particularly unusual for an operator to rest his hand on the sidebed or even to tap the corrugated blanks with the other hand despite the futility of that procedure.

Mr. Markle testified that as he leaned on his left hand and tapped corrugated blanks with his right hand, his left hand slipped toward his left and his fingers, like a wedge, went under the toe guard and became caught in the nip point.

Plaintiff's employer investigated this accident. Not surprisingly, the employer concluded that its Maintenance Department had properly maintained the machine and that the guard was at its correct height before the accident. Thus, the only way to explain this accident, according to the employer, was that the sidebed must have deflected downward such that the space between the sidebed and the guard was increased. However, none of the other machine operators had

-7-

ever noticed the sidebed deflecting. No one had ever reported that the sidebed deflected. The International Paper employee responsible for the investigation, Joseph Valania, testified in deposition that after the accident, he leaned over and pressed down on the sidebed and it deflected. He could not describe how much or to what degree it deflected. He said he pressed on the side table only about an inch or so from the front of the guard. He says the surface of the table did spring back after he removed his hand. The toe guard had been moved and was twisted a bit when he did this test. Mr. Valania interviewed the plaintiff but the plaintiff did not know what happened. Mr. Valania concluded that the table flexed enough to give extra room between the guard and the sidebed so that the plaintiff's hand could get caught in the nip point.

  International Paper's maintenance manager, Jim Sienkiewicz, was also deposed, he testified that no one had ever suffered any kind of accident or injury on this particular Saturn FFG. He had observed operators leaning over the sidebed and using their hands to stabilize themselves and yet he never saw the feed table sidebed flex. No one ever reported to him that the sidebed top flexed. He himself had pressed down on the sidebed during maintenance procedures relating to elevation of the rolls, he used his right hand because he is left handed, the table never flexed and he did this quarterly. Mr. Sienkiewicz is 5'11" tall and weighs 230 lbs. Mr. Sienkiewicz testified that he was called at home after the accident and when he arrived, he noticed some deflection on the table which he believed was caused by the pry bars used by co-workers trying to free the plaintiff.

  Significantly, Mr. Sienkiewicz says that he measured the gap between the toe guard and the sidebed after the accident. On the opposite side, the drive side, the distance was slightly less than 1/2 inch. On the operator's side where the incident occurred, the distance was more like $5/8^{ths}$ of an inch. He thought the difference might have been caused by the use of the pry bars.

He put his left hand on the surface of the sidebed and applied force and he said he witnessed a minor deflection.  He said it might have been an additional 1/8 inch or maybe as much as 1/4 inch.  Mr. Sienkiewicz says that when he lifted his hand, the table returned to its normal position.

Mr. Sienkiewicz also testified that the gap between the toe guard and the sidebed was probably about 1/2 inch before the accident which he said might be enough to accommodate fingertips.  The weight of the plaintiff's body and his forward momentum, he felt, created a wedge-like effect.  He concluded that the table deflected when plaintiff's hand acted like a wedge.  He had the Maintenance Department place an angle bracket under the sidebed in the inboard area to provide further support for the sidebed near the toe guard.

## **PROCEDURAL HISTORY**

On September 6, 2000, Langston filed Voluntary Petition for Bankruptcy under Chapter 11.  On June 7, 2001 plaintiff filed a Petition for relief from the stay moving to liquidate his claims and recover any favorable judgment or settlement in excess of any self-insured retention from the proceeds of Langston's insurance policies in effect at the time of the incident.  On June 11, 2001 Langston's Chapter 11 case was converted to a case under Chapter 7.  Finally and without notice to Prime, on August 27, 2001 plaintiff and Langston entered a Stipulation which specifically provided that the plaintiff waived any claim against Langston other than against Langston's insurance proceeds.  Additionally, the plaintiff agreed that any settlement would include a general release of any and all claims arising from the accident which the plaintiff could raise against Langston.  Langston's self-insured retention is $175,000.00.  This suit followed.

## LEGAL ARGUMENT

The August 27, 2001 Stipulation entered into by the plaintiff and Langston, operated to unconditionally waive the $175,000 self-insured retention. The agreement failed to expressly reserve rights against Langston, therefore, it absolves both AIG, Langston's insurer, and Prime, an alleged joint tort-feasor, of that portion from any judgment.

The Stipulation between the Langston trustee and plaintiff Markle reads in part:

> 3. James Markle <u>waives</u> any claims against the Debtor and Debtor's estate, (unless there was no insurance in effect covering his injuries to any extent, at the time of the accident) other than his claims against the insurance proceeds and James Markle agrees that any settlement entered into by James Markle include a <u>general</u> release of any and all claims arising from the Accident James Markle may currently be able to raise or may in the future raise against the Debtor and Debtor's estate. (Emphasis added) *See Exhibit 1*.

The plaintiff entered into the Stipulation because Langston, at the time, was in dissolution Chapter 7 bankruptcy. The Stipulation was a way to move the claim against AIG, Langston's insurer, forward. The plaintiff knew when executing the Stipulation that it would operate to preclude recovery of the $175,000 from either Langston, which he agreed to expressly release, or AIG, which is contractually liable for only that amount in excess of the $175,000 self-insured retention. Nevertheless, the plaintiff agreed to the Stipulation without expressly reserving his right to pursue Langston within the bankruptcy case for the amount of the self-insured retention.

Because the plaintiff's claim rests solely on a strict products liability theory, the defendants, if found liable, will be responsible for equal portions of the judgment.[3] Langston's

---

[3] <u>Walton v. Avco Corp.</u>, 610 A.2d 454 (Pa. 1992) (stating no apportionment of liability can be made between tortfeasors who are *only* found strictly liable.).

-9-

insurer, having already been vicariously released from the first $175,000, would be responsible for Langston's share that exceeds the $175,000 self-insured retention. Prime would pay its full share – 50% of the verdict, if it is found liable. The plaintiff may then seek to recover from Prime the $175,000 he intended to waive in order to expedite his receipt of payment from Langston's solvent insurer. Importantly, the plaintiff did not reserve any right to proceed against other joint tortfeasors in the stipulated order. If, in addition to paying its equal portion of any judgment, Prime were ordered to pay the $175,000 that the plaintiff contracted out of the case, Prime, due solely to the actions between the plaintiff and Langston, would have no right of contribution for this amount as it relates to Langston and/or its insurer. Because the Stipulation fails to reserve rights against Langston, and its insurer is contractually precluded from paying the self-insured retention, Prime would have no legal claim against either. It would be inequitable for Prime to pay in excess of its share of the liability because of the waiver entered into by plaintiff and Langston.

The waiver entered into between plaintiff and Langston is akin to the general release executed in _Smith v. Fenner_.[4] In _Smith_ the Pennsylvania Supreme Court, applying the Uniform Contribution Among Tort-feasors Act, found that a signed general release precluded joint-tortfeasors from collecting on a right of contribution against the released tortfeasor. In that case Smith sued Falcone and McBeth for negligence arising out of a car accident. Falcone and McBeth joined Fenner on the theory that Fenner was either solely or jointly liable to Smith, or liable over to them. Fenner answered the complaint and affirmatively defended the suit on the

---

[4] 161 A.2d 150 (Pa. 1960).

grounds that he signed a general release with plaintiff Smith.[5] Following a jury verdict and finding of joint negligence by Falcone, McBeth, and Fenner, both Falcone and McBeth pressed their right of contribution against Fenner. Significantly, the release entered into between Fenner and plaintiff did not reserve the right to collect from Fenner. The Court found as a result of the

---

[5] *Id.* at 152, n.1. The release reads: 'Know all men by these presents, that Smith, being of legal age, for and in consideration of the payment of Four Thousand five hundred ($4,500) Dollars by Willis Fenner and Donald Fenner the receipt of which is hereby acknowledged, have released and discharged, and by this release do for myself, my heirs, executors, administrators and assigns, release and discharge the said

> [Fenners] from all claims, damages, actions and suits of whatsoever kind, known or unknown prior to and including the date hereof, and particularly for all injuries to person or damage to property, known or unknown, resulting from or to result from an accident which occurred on or about the 4th day of June, 1950, at or near Route 712 east of Bangor, Pennsylvania.
>
> 'Should it appear that two or more persons or entities are jointly or severally liable in tort for the said injuries to person or damage to property resulting from or arising out of said accident, the consideration for this release shall be received in reduction of the total damages recoverable against all the other tortfeasors to the extent of the pro rata share of the said [Fenners] and I specifically reserve all claims and causes of action arising out of the above-mentioned accident against all the other tortfeasors. of the Uniform Act the rule was well established warranty that I have not received heretofore any consideration whatever for, nor have I released heretofore any person, firm, or corporation from any claim or liability for any injuries to person or property arising from said accident, and I agree to hold harmless and indemnify the said [Fenners] and his Insurance Carrier of and from any loss, claim, liability, cost or expense growing out of any claim against them or either of them for contribution by any alleged joint tortfeasor under the Uniform Contribution Among Tortfeasors Act of the Commonwealth of Pennsylvania.
>
> 'I further state I have carefully read the foregoing Release and know the contents thereof, and that I am signing the same as my own free act. I further intend to be legally bound by the promises herein contained.
>
> 'If this release is executed by more than one person as releasor, the obligation, responsibility and liability of each such person shall be joint and several.
>
> Witness my hand and seal this 28 day of May, 1952, in the presence of:
>
> '(s) Herbert F. Smith (Seal)
>
> '........ (Seal)
>
> '(s) Beulah M. Smith,
>
> 232 Miller St., Bangor, Pa.
>
> Address
>
> '(s) S. Maxwell Flitter, Atty.,
>
> Alpha Bldg., Easton, Pa.
>
> 'Witnesses'

-11-

general release neither Falcone nor McBeth had a right of contribution over Fenner. This plaintiff could only collect the exact percentage share of the verdict as assessed against Falcone and McBeth.

In the instant case, plaintiff Markle's waiver with Langston acted as a general release with respect to Prime. The release failed to reserve plaintiff's rights against Langston for the $175,000 self-insured retention because at the time the order was signed plaintiff was well aware that insurance proceeds existed. Additionally, the order fails to expressly reserve the right to make claims against additional tortfeasors.[6] As a result of the unambiguous language contained in the waiver, Prime has no right of contribution against Langston as to the $175,000 amount. That amount, therefore, is unrecoverable by the plaintiff.

In 2001, the Superior Court of Pennsylvania decided an analogous case. In <u>Kleban v. National Union Fire Insurance Company of Pittsburgh, PA</u>,[7] plaintiff Kleban dove into a pool owned by Simonds and manufactured by Heldor. Kleban sustained quadriplegic injuries. Kleban settled his case with Simonds and went to trial against Heldor. Heldor was insured by National Union, but had a self-insured retention amount of $250,000. Prior to trial, Heldor filed for bankruptcy. The Bankruptcy Court allowed Kleban to lift the stay and liquidate his claims against Heldor so that he could pursue his claims covered by the solvent insurer.[8] Following the verdict, the insurer paid Heldor's share less the $250,000 self-insured retention. Five years later, Kleban sued to force the insurer to pay the $250,000 self-insured retention. In

---

[6] *See* Taylor v. Solberg, 778 A.2d 664 (Pa. 2001) (stating the effect of a release determined by ordinary meaning of its language).

[7] 771 A.2d 39 (Pa. Super. 2001).

[8] *Id.* at 44. The order reads in part: "3. To the extent the amount of any judgment or award obtained in the state court Action is not payable from the available insurance proceeds including, specifically, to the extent the amount of any award or settlement falls within the self-insured retention or exceeds the upper limit of insurance coverage, Movant expressly reserves his right to assert a claim against the Debtor or its estate for any such amounts, pursuant to the proof of claim which Movant has previously filed with the Bankruptcy Court."

that bankruptcy court order, unlike the order at issue in the instant case, the plaintiff expressly reserved his right to assert a claim against Heldor. As a result of both the order and the terms of the insurance policy, the court determined that the self-insured retention was the sole responsibility of the insured. This case is instructive because it holds that the terms of the stipulation will be enforced against the parties.

In the instant case, Markle waived the first $175,000 of any judgment when he signed the bankruptcy order on August 27, 2001 in order to expedite this suit. Much like the court decided in *Kleban*, only Langston, the insured, was responsible for that $175,000 self-insured retention, and the Stipulation waives that retention.

Finally, the right of contribution is grounded in equity. Assuming Prime and Langston were found jointly liable under the strict liability claim, a clear inequity would result if Prime were ordered to pay the $175,000 self-insured retention that the plaintiff waived with the insolvent insured.[9] Prime would be precluded both under the case law and contractually from exercising any right of contribution against the insolvent Langston or its insurer.

---

[9] *See* Union Paving Co. v. Thomas, 9 F.R.D 612 (E.D.Pa. 1949) (stating contribution among joint tort-feasors allowable except where contribution inequitable).

DOCS_PH 1425314v1

-14-

## CONCLUSION

For the foregoing reasons, defendant, Prime, respectfully requests that this Honorable Court grants its Motion *in Limine*.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**
Attorneys for Defendant
Prime Technology, Inc.

_____

**JOHN A. ORLANDO, Esquire**
**JOSEPH G. SAUDER, Esquire**
Id Nos. 38420/82467
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-7176/7133

## **CERTIFICATE OF SERVICE**

      I, John A. Orlando, Esquire, hereby certify that a copy of the attached Memorandum of Law in Support of Motion in Limine has been served on the following individual(s) by first class mail, postage prepaid, on the date below:

| | |
|---|---|
| Alan M. Feldman, Esquire | Donald M. Davis, Esquire |
| Daniel J. Mann, Esquire | Leonard Lipson, Esquire |
| FELDMAN, SHEPHERD, | MARGOLIS EDELSTEIN |
|  WOHLGELERNTER & TANNER | The Curtis Center, 4th Floor |
| 1845 Walnut Street, 25th Floor | Independence Square West |
| Philadelphia, PA 19103 | Philadelphia, PA 19106-3304 |

                                          **WHITE AND WILLIAMS LLP**
                                          Attorneys for Defendant
                                          Prime Technology, Inc.

                                          By:_____
                                               John A. Orlando, Esquire

Dated: 5/16/03