IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES A. MARKLE and<br>LINDA M. MARKLE, his wife | : | 02-CV-2607 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LANGSTON CORPORATION and<br>PRIME TECHNOLOGY, INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

AND NOW, this _____ day of _____ 2003, upon consideration of defendant Prime Technology, Inc.'s Motion in Limine to Preclude the Testimony of plaintiffs' expert, Craig D. Clauser, P.E., and any Responses thereto, IT IS HEREBY ORDERED that Mr. Clauser is precluded from testifying at trial based on the lack of any description of methods and procedures contained within his report to indicate its reliability.

BY THE COURT:

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES A. MARKLE and<br>LINDA M. MARKLE, his wife | : | 02-CV-2607 |
| Plaintiff, | : | |
| v. | : | |
| LANGSTON CORPORATION and<br>PRIME TECHNOLOGY, INC. | : | |
| Defendants. | : | |

**DEFENDANT PRIME TECHNOLOGY, INC.'S
MOTION IN LIMINE TO PRECLUDE THE TESTIMONY
OF PLAINTIFF'S EXPERT, CRAIG D. CLAUSER, P.E.**

Defendant Prime Technology, Inc., (Prime), by and through its undersigned counsel, White and Williams LLP, hereby moves *in limine* to preclude the testimony of plaintiffs' expert Craig D. Clauser, P.E., and his report and in support thereof, avers as follows:

1. This matter involves personal injuries sustained by plaintiff James A. Markle on 6/29/00 while he was operating a cardboard box-making machine known as a Saturn Flexo Folder-Gluer assembled and sold by co-defendant Langston Corporation (Langston).

2. Langston ordered from Prime a Prime Shur-Feed feeding mechanism that would feed one corrugated blank at a time into the Langston Flexo Folder-Gluer machinery. Because the corrugated blanks vary in width, the actual feed table also has smooth stainless steel sidebeds which can support wider corrugated blanks for larger-sized boxes.

DOCS_PH 1425500v1

3.  The sidebed manufactured by Prime was shipped to Langston and Langston assembled it and decided on all assembly and manufacturing issues when Langston incorporated the Prime feeding mechanism into its Saturn Flexo Folder-Gluer machine.

4.  The sidebed was made from 11 gauge stainless steel, it is about 1/8th inch thick, it is about 28½ inches long on its horizontal surface and then curves downward, significantly strengthening it, the downward run is about 15 inches long.  The 11 gauge stainless steel sidebed table is 20½ inches wide and is supported at both ends by resting upon the several inch wide structural steel members consisting of the frame of the Saturn Flexo Folder-Gluer.  *See Exhibit 1 for a color photo of the sidebed, the blue frame and some bolts supporting the sidebed to the frame are visible in this picture.*

5.  Plaintiff said that he was leaning on the sidebed with his left hand while reaching up with his right hand to tap some of the corrugated blanks to make sure they lined up properly for being fed into the Flexo-Folder Gluer machine.  Mr. Markle, who is only about 5'3" tall and weighs only about 160 lbs., testified that his left hand, on which he was leaning, slipped and slid toward the yellow guard and actually went under the guard so that his fingers got caught in the initial in-turning rolls of the Langston Flexo-Folder Gluer machine.

6.  Plaintiffs' expert has issued a report in which he simply compares the 11 gauge stainless steel used to make the Prime sidebed table with much older machines which employ cast iron.  Mr. Clauser writes:

> The 11 gauge 304 stainless steel sheet metal used by Prime Technology for this table was significantly lighter than the original cast iron structure which it replaced.

Mr. Clauser does not indicate why the weight of the material plays any role in its strength or stiffness, he gives no scientific data comparing the materials nor does he perform any tests or

-2-

provide any scientific data on the actual qualities and strengths of 11 gauge stainless steel. *See Exhibit 2 for a copy of Mr. Clauser's report.*

7. Mr. Clauser also opines that one edge of the table was stiffened by the 15 inch deep front face which bends to become perpendicular to the ground. However, he claims that the other edge, the inboard side under the guard was "unstiffened". He offers no explanation, offers no parameters, offers no scientific data on the stiffness, strength and quality of 11 gauge stainless steel given its side to side supports, he notes no testing, notes no experiments. Rather, he simply concludes that the 11 gauge stainless steel "could deflect enough" for plaintiff's fingers to pass under the guard simply by the weight of the plaintiff pushing down on the 11 gauge stainless steel.

8. A proponent of expert testimony must establish that his expert is qualified and his testimony is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 587 n. 10 (1993). To be admissible, expert testimony must meet the requirements set forth in Federal Rules of Evidence 702 and 703. *In Re: Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994) *cert. denied*, 513 U.S. 1190 (1995).

9. Rule 702 has two major requirements: the witness must be qualified to be an expert, and the expert's testimony must meet the requirements of *Daubert*. *See Dennis v. Pertec Comp.*, 927 F.Supp. 156, 159 (D.N.J. 1996), *aff'd*, 135 F.3d 764 (3d Cir. 1997). The *Daubert* standards have extended to all technical experts. *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999) (tire expert); *Elcock v. Kmart Corporation*, 233 F.3d 734 (3d Cir. 2000) (vocational expert).

10. The inquiry into the second requirement of reliability requires the court to examine whether the expert's opinion is reliable based on methods and procedures of science

-3-

rather than on subjective belief or unsupported speculation.  *Elcock*, 233 F.3d at 745; *Paoli*, 35 F.3d at 742.

    11.    The Third Circuit Court of Appeals has observed that *Daubert* suggests several factors that a district court should take into account in evaluating whether a particular methodology is reliable.  *Id*.  They are:

    (1)    whether a method consists of a testable hypothesis;

    (2)    whether the method has been subject to peer review;

    (3)    the known or potential rate of error;

    (4)    the existence and maintenance of standards controlling the technique's operation;

    (5)    whether the method is generally accepted;

    (6)    the relationship of the technique to methods which have been established to be reliable;

    (7)    the qualifications of the expert witness testifying based upon the methodology; and

    (8)    the non-judicial uses to which the method has been put.

*Elcock*, 733 F.3d at 745-746; *Paoli*, 35 F.3d at 742 and 742 n. 8.

    12.    Mr. Clauser's opinion that the sidebed was defective because it was "significantly lighter" than cast iron or because it was "unstiffened" is the result of no discernable methodology, this opinion is the result of conclusory terms without any scientific explanation, these opinions are unsupported by any calculations, these opinions are not reliable under the *Daubert* standard.  Accordingly, Mr. Clauser's opinion should be precluded.

WHEREFORE, defendant Prime Technology, Inc. respectfully requests that this Honorable Court grant its Motion in Limine and preclude the testimony of plaintiffs' expert, Craig D. Clauser, P.E.

                                              Respectfully submitted

                                              **WHITE AND WILLIAMS LLP**
                                              Attorneys for Defendant,
                                              Prime Technology, Inc.

                                              _____
                                              John A. Orlando, Esquire
                                              Identification No. 38420
                                              1800 One Liberty Place
                                              Philadelphia, PA 19103-7395
                                              (215) 864-7176

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES A. MARKLE and<br>LINDA M. MARKLE, his wife | : | 02-CV-2607 |
| Plaintiff, | : | |
| v. | : | |
| LANGSTON CORPORATION and<br>PRIME TECHNOLOGY, INC. | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PRIME TECHNOLOGY, INC.'S
MOTION IN LIMINE TO PRECLUDE THE TESTIMONY
OF PLAINTIFF'S EXPERT, CRAIG D. CLAUSER, P.E.**

**I.   INTRODUCTION**

In approximately 1988, co-defendant Langston Corporation (Langston) sold a Saturn model Flexo Folder-Gluer Counter-Ejector to the Mount Carmel, PA facility of Cardinal Container which was later purchased by International Paper. As described by Langston:

> The Saturn Flexo Folder-Gluer Counter-Ejector is a combination
> of individual machine sections which accept a stack of blanks
> (sheets) and discharge printed, slotted and glued collapsed boxes in
> bundles of pre-determined count.

See Langston Finishing Machinery Operation and Maintenance Technical Literature Bulletin.

The Saturn Flexo Folder-Gluer Counter-Ejector (Saturn FFG) that plaintiff was running at the time of his accident was also equipped with a pre-feed section which automatically fed the corrugated blanks into the feed section of the Saturn FFG.

The Saturn FFG begins its work of converting corrugated sheets into printed, slotted and glued collapsed boxes at the feed section.  As its name implies, the feed section takes a single corrugated blank and feeds it in a timed system into the next printing section of the Saturn FFG

Although Langston's Chapter 11 Bankruptcy filing was converted to a Chapter 7 filing, its former chief engineer, George Mills, was available for deposition.  Mr. Mills explained that on the Saturn FFGs, Langston typically sold a kicker feeder, this first machine section in the Saturn FFGs would literally grab a single corrugated blank and kick it into the first nip point so that the blank could begin its process through the various sections and become a completed collapsed cardboard box.  The kicker feeders, however, presented problems because corrugated tends to warp and any warped blanks would jam rather than feed properly into the machine. Beginning in the 1970s, efforts were made to provide vacuum assistance, the vacuum would pull down on the corrugated blanks, the idea was to overcome the natural warping of the corrugated blanks so that the kicker feeder would not jam so often.

The initial vacuum assistance designs for the kicker feeders were only partially successful.  In the middle 1980s, defendant Prime Technology, Inc. (Prime) developed a kickerless feeder, this component, by means of rollers, would grab the leading edge of a single corrugated blank, pull it down flat to remove any warpage by means of the rollers and a vacuum system and the blanks would be literally rolled into the initial nip point on the printing section of various Flexo Folder-Gluers.

Cardinal Container, the predecessor to International Paper, plaintiff's employer at the time of the accident, purchased a Saturn FFG but specifically requested of Langston that a Prime leading edge feeder be incorporated at the feed section of the Saturn FFG.  The critical component to the Prime leading edge feeder was the wheel box, the central portion of the feeder.

-2-

The Prime leading edge feeder was particularly sought after because the drive wheels feeding the corrugated blanks were powered through a rocker shaft from other components in this group of machines through linkage, the Prime leading edge feeder did not require its own transmission.

Because its customer requested it, Langston ordered a Prime leading edge feeder so it could incorporate that component into its Saturn FFG which it was then building for plaintiff's employer. Langston received the Prime leading edge feeder and sidebeds and other parts and built the leading edge feeder into the frame which supports all of the machinery that composes the Saturn FFG. The moving parts to the leading edge feeder are centered, the sidebeds are 11 gauge steel supported by frames for the Langston Saturn FFG and the sidebeds cover the various rocker shafts and transmission parts which run all components of the Saturn FFG. Prime also supplied mounting clips, small pieces of angle iron which provide further support for the sidebeds. Actually mounting the sidebeds was a task performed by Langston, Langston was fully aware of the need to mount the sidebeds firmly and securely and, of course, pursuant to OSHA regulations, Langston was required to test all components of the machine before shipping and installing it at Cardinal/International Paper.

Consistent with the drawings at Exhibit 3 and as actually measured by the various experts who examined the machine after this accident, the operator sidebed shipped by Prime to Langston was an L-shaped stainless steel fabrication, the leg of the "L" was approximately 15 inches, the upright or length of the "L" formed a flat surface for the sidebed table and it measured 31-5/8 inches in length. The sidebed was 20-3/8 inches wide. The flat surface portion of the sidebed was shipped as a complete rectangle, however, apparently to make room for other Langston equipment, Langston cut a portion from the operator side inboard edge of the surface of the sidebed.

-3-

The initial nip point, the two rollers that accept the corrugated blank from the leading edge feeder as it begins its process through the Saturn FFG is guarded by a yellow toe guard.[1]

In this case, according to the Prime records, the leading edge feeder was designed with a 4-3/4 inch stroke which would be the distance from the face of the gate[2], actually mounted on the toe guard, to the first nip point, the initial rollers on the first printing station.  Since the distance from the nip point to the toe guard was probably about 3-1/2 inches, allowing an inch or so for the width of the gate, OSHA standards dictate that the maximum opening beneath the toe guard to the top of the sidebed would be one-half inch.  The actual height of the opening between the bottom of the toe guard and the top of the sidebed on the date of this accident remains very much in dispute.

Specifically, Langston's former chief engineer George Mills testified that the height of the toe guard would range from .6 inches to .75 inches to allow for the thickest corrugated blank that could be printed, folded and glued on the Saturn FFG.  The Langston assembly drawing, which Langston apparently claims was not indicative of this as-built machine, included instructions for the workers installing the toe guard at a customer's plant to install it at 15/16ths of an inch above the top of the sidebed.  To free Mr. Markle after his hand was caught in this nip point, below the toe guard but above the sidebed, co-workers used pry bars and eventually unbolted the toe guard.  The employer claims that the toe guard was placed back into the same

---

[1] In the olden days, workers might need to stand on a sidebed to maintain the kicker feeder or for a variety of reasons to keep the machine functioning.  Thus, the initial guard was called a toe guard.  The distance between the top of the sidebed and the bottom of the toe guard is critical, that distance is actually governed by an OSHA standard.  If the nip point is very close to the back of the toe guard, then the toe guard must be very close to the top of the sidebed.  If the nip point is farther back, the space between the guard and the sidebed can be a little higher, for example it might be permissible to allow a finger under the toe guard as long as the hand, wrist and forearm could not get there if the nip point was far enough behind the toe guard.

[2] The gate is raised or lowered depending on the corrugated blank to permit only one blank at a time to pass into the first set of rollers.

DOCS_PH 1425500v1

position as before the accident and that it was not changed until the date of the inspection by the various experts involved in this case. On that date, the distance between the bottom of the toe guard and the top of the sidebed was about $5/16^{ths}$ of an inch. Langston claims that the toe guard was not adjustable and thus that $5/16^{ths}$ of an inch measurement represents how the Saturn FFG was originally configured. However, Paul Zarko, a maintenance worker at International Paper, testified that International Paper issued a directive before this accident occurred calling for all toe guards to be dropped, the company wanted toe guards on all machines including the Saturn FFG to be lowered. Mr. Zarko testified that he knew the toe guard on the Saturn FFG had been lowered before the date of the accident although he was not able to provide any measurement. Photographs of the toe guard taken at various times show that the toe guard was painted and the mounting bolts may be different.

**II.     LEGAL ARGUMENT**

    **A.     Legal Standard for Admissibility of Expert Testimony.**

A proponent of expert testimony must establish that his expert is qualified and his testimony is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 587 n. 10 (1993). To be admissible, expert testimony must meet the requirements set forth in Federal Rules of Evidence 702 and 703. *In Re: Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994) *cert. denied*, 513 U.S. 1190 (1995).

Rule 702 has two major requirements: the witness must be qualified to be an expert, and the expert's testimony must meet the requirements of *Daubert*. *See Dennis v. Pertec Comp.*, 927 F.Supp. 156, 159 (D.N.J. 1996), *aff'd*, 135 F.3d 764 (3d Cir. 1997). Although the *Daubert* standards were adopted in a case involving a scientific expert, those standards have since been extended to technical experts. *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct.

1167 (1999)(tire expert); *Elcock v. Kmart Corporation*, 233 F.3d 734 (3d Cir. 2000) (vocational expert).

With respect to the first requirement, when making a finding regarding an expert's qualifications, the trial court is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied* 513 U.S. 1111 (1995).

The inquiry into the second requirement of reliability requires the court to examine whether the expert's opinion is reliable based on methods and procedures of science rather than on subjective belief or unsupported speculation. *Elcock*, 233 F.3d at 745; *Paoli*, 35 F.3d at 742. The Third Circuit Court of Appeals has observed that *Daubert* suggests several factors that a district court should take into account in evaluating whether a particular methodology is reliable. *Id*. They are:

(1) whether a method consists of a testable hypothesis;

(2) whether the method has been subject to peer review;

(3) the known or potential rate of error;

(4) the existence and maintenance of standards controlling the technique's operation;

(5) whether the method is generally accepted;

(6) the relationship of the technique to methods which have been established to be reliable;

(7) the qualifications of the expert witness testifying based upon the methodology; and

(8) the non-judicial uses to which the method has been put.

*Elcock*, 733 F.3d at 745-746; *Paoli*, 35 F.3d at 742 and 742 n.8.

The Third Circuit has observed that the *Daubert* factors are non-exclusive and each factor does not have to be applied in every case. *Elcock*, 733 F.3d at 746. The same factors, however,

-6-

should be considered when testing the reliability of a non-scientific method. *Id*. Quoting from the Supreme Court's decision in <u>Kuhmo Tire</u>, the Third Circuit stated:

> *Daubert*'s gatekeeping requirement...makes certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field...The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

<u>Id</u>. (quoting <u>Kumho Tire</u>, 526 U.S. at 152).

Whatever the proffered field of expert testimony, the court must exercise its "gatekeeper" function. When scientists or technicians testify in court, they must bring the same intellectual rigor to the task that is required of them in other professional settings. <u>Kumho Tire</u>, 526 U.S. at 152.

Rule 703 focuses on the data underlying the expert's opinion. The trial court must "assess whether there are good grounds to rely on (an expert's) data to draw the conclusion reached by the expert." <u>Paoli</u>, 35 F.3d at 749.

As set forth more fully below, an application of these factors to Mr. Clauser's opinions indicates that there is no discernable methodology. Accordingly, his testimony should be excluded from the trial of this matter.

### B.    The Opinions of Mr. Clauser

As indicated in Prime's Motion, plaintiffs' liability expert, Craig D. Clauser, P.E. offers simply conclusory opinions to the effect that the Prime 11 gauge stainless steel top for the sidebed was "significantly lighter" than the original cast iron structures formerly used by Langston when Langston used its own feeding sections on its Flexo-Folder Gluer machines. Respectfully, whether a product is heavier or lighter is simply not scientifically relevant to its

strengths, its material properties, its size and shape, in short, its strength and usefulness for a given purpose.

Mr. Clauser also opines that the inboard portion of the sidebed table top, the area near the guard, was "unstiffened", a rather meaningless term. He offers no calculations, he provides no reliable meaning to these conclusory terms. He offers no calculations although the relevant facts are known in this case. For example, the type of steel, 11 gauge stainless steel, is well known in the industry and its properties are available from various published sources. Furthermore, the width of the material is known and undisputed. The width of the supporting members beneath the material and the fact that the 11 gauge stainless steel sidebed top was firmly bolted in at least six locations is also known and undisputed. There has been no evidence offered in this case that those bolts were loose or that the supporting material flexed in any way.

Nevertheless, Mr. Clauser did not perform any tests, he offers no calculations, he does not explain the methodology he used to reach his opinion that the 11 gauge stainless steel material of the sidebed "could deflect enough" for plaintiff's fingers to pass under the guard. He does not share with us how much it "could deflect", how he reaches that opinion given the physical and material properties of 11 gauge stainless steel and given the known weight of the plaintiff.

**III.    CONCLUSION**

       For all the above reasons, defendant respectfully requests that this Honorable Court grant its Motion in Limine and preclude plaintiffs' expert from offering conclusory opinions that are totally unsupported by any scientific data, testing or accepted methodology.

                                     Respectfully submitted,

                                      **WHITE AND WILLIAMS LLP**
                                      Attorneys for Defendant,
                                      Prime Technology, Inc.

                                      _____

                                      John A. Orlando, Esquire
                                      Identification No. 38420
                                      1800 One Liberty Place
                                      Philadelphia, PA 19103-7395
                                      (215) 864-7176

# CERTIFICATE OF SERVICE

      I, John A. Orlando, Esquire, hereby certify that a copy of the attached Motion in Limine to Preclude the Testimony of plaintiffs' expert Craig D. Clauser, P.E., has been served on the following individual(s) by first class mail, postage prepaid, on the date below:

| | |
|---|---|
| Alan M. Feldman, Esquire | Donald M. Davis, Esquire |
| Daniel J. Mann, Esquire | Leonard Lipson, Esquire |
| FELDMAN, SHEPHERD, | MARGOLIS EDELSTEIN |
| WOHLGELERNTER & TANNER | The Curtis Center, 4th Floor |
| 1845 Walnut Street, 25th Floor | Independence Square West |
| Philadelphia, PA 19103 | Philadelphia, PA 19106-3304 |

                                    **WHITE AND WILLIAMS LLP**
                                    Attorneys for Defendant
                                    Prime Technology, Inc.

                                    By:_____
                                          John A. Orlando, Esquire

Dated: 5/16/03